McBRIDE, Judge.
The defendants, Martin and his liability insurance carrier, Argonaut Insurance Company, appealed from a solidary judgment against them in favor of Mrs. Irwin J. Schexnayder for $10,000 for physical injuries, and in favor of her husband for $1,316.39 for property damage and medical expenses, incurred as the result of a collision between a Renault automobile driven by Mrs. Schexnayder and a Chevrolet car driven by defendant Martin, which occurred at 2:30 a. m., on May IS, 1960, in the intersection formed by Albert Street and Railroad Avenue in the town of Lutcher, Parish of St. James. The appeal has *617 been answered by plaintiffs who pray that the amounts of the judgment be substantially increased.
Mrs. Schexnayder was driving eastwardly on Railroad Avenue; Martin was operating his Chevrolet car in a northerly direction on Albert Street. A series of railroad tracks situated on an embankment 5 or 6 feet higher than the street level parallel Railroad Avenue on its south side.
Several specific charges of negligence are levelled against Martin, all of which the defendants deny, and in the alternative they plead that Mrs. Schexnayder was guilty of contributory negligence. There is no need for detailing these charges and counter-charges of negligence. The intersection is controlled by a semaphore traffic light signal and the case must turn upon a determination of which motorist entered the intersection on the green signal light as each claims the benefit of a favorable light. The testimony of one set of witnesses is diametrically opposed to the testimony of the witnesses on the other side, and, not alone that, there is disagreement between the witnesses in each camp amongst themselves as to certain facts. The trial judge aptly remarked in his reasons for judgment: “The light could not possibly have been green for both vehicles, and one group of witnesses is obviously lying.”
Mrs. Schexnayder and her husband are newspaper distributors, and on the morning the accident occurred they had just started out to make delivery of the early morning paper.
Mrs. Schexnayder testified that, driving slowly, she approached the intersection about 10 or 15 miles per hour awaiting a favorable change of the signal light; that when she reached a point about 10 feet from Albert Street, the light changed to green, whereupon she made entry into the intersection. She claims that her automobile was then struck by Martin’s Chevrolet. However, from other evidence in the record it would appear to us that it was the other way around and we think the Renault struck the Chevrolet. However, this particular circumstance would make no difference in deciding who was negligent as the focal question is still there — which motorist emerged into the intersection on the green light?
It is crucial in cases of this type that a determination be made, if possible, of which driver was proceeding on the green light for when a crossing is protected by electric semaphore lights, it is not essential for the favored driver to look for violations by side street traffic facing the red light. Youngblood v. Robison, 239 La. 338, 118 So.2d 431; Washington Fire & Marine Insurance Company v. Williams, La.App., 144 So.2d 737.
For some reason, on cross-examination Mrs. Schexnayder testified that when she first looked at the light it was “on caution,” or yellow, and then turned green when she was 9 or 10 feet away from the intersection. This is the weakest point in her testimony. It is undisputably shown by the record that the light is so regulated that it changed directly from red to green. We do not know what made Mrs. Schexnayder mention a yellow light, but, be that as it may, her statement that she entered the intersection on a green light is supported by the testimony of her witnesses notwithstanding their disagreement as to other circumstances.
Her husband, Irwin Schexnayder, testified that he was following his wife in another automobile at a distance of from 175 to 200 feet. He did not see the Chevrolet coming toward the intersection, perhaps because of the railroad embankment, but he emphatically stated that the light facing his wife was green when she made entry into Albert Street. He contradicted her testimony with respect to a yellow light by stating positively that the light turned from red to green. Rodrigue, a night watchman, who was standing about 150 feet from the intersection, facing the light, corroborated Mrs. Schexnayder’s assertion that the light was showing green for traffic proceeding in the direction she was traveling and that she *618 entered the intersection on such favorable light.
Opposed to this is the evidence given by-Martin and his two witnesses, Mrs. Camp and Templet.
About 8 o’clock on the evening preceding the date of the accident, Martin, by prearrangement, met with one of his firm’s customers at Lambert’s Cafe in the town of Sorrento to discuss some business. After they had dined and concluded their discussion, the customer left but Martin remained in the establishment until closing time at 1 o’clock in the morning. Mrs. Camp, a waitress, was present as were her son, Templet and his girl friend, and a young boy and girl. Martin, together with these persons, left the establishment, he agreeing to drive them to their homes. The one whom the witnesses referred to as “the little girl” was taken to her home in Convent, after which Martin continued onward toward Lutcher. The testimony of Martin and his two witnesses as to the events prior to the accident, particularly as to the amount of alcoholic beverages consumed by him, is in hopeless conflict. At the inception of the trial, while on cross-examination, Martin testified he had but one drink, a highball. Later, Mrs. Camp, on her direct examination, stated that she and Martin had a drink alsq at the Gold Place Bar. Then, on cross-examination, she said they each drank two highballs at the Gold Place Bar. She further mentioned that Martin had a beer or two at Lambert’s. The second time Martin took the witness stand, which was after Mrs. Camp had testified, he admitted he had consumed two cans of beer and one highball at Lambert’s and two highballs at the Gold Place Bar. Then, when confronted with Templet’s deposition, he admitted to having had another highball at Lambert’s.
The trial judge characterized Martin as “a man whose wits were befuddled by alcohol.” We do not know whether Martin had ingested a sufficient volume of alcohol to dull his senses or to interfere with his ability to safely operate his automobile, but we are inclined to believe that the alcohol did have some effect on Martin. He claimed he was entirely familiar with the area in which the accident occurred, having driven through Lutcher on many occasions. He was traveling north on Albert Street in order to reach the Airline Highway, but when confronted with the fact that he could not possibly get to the Airline by going out Albert Street, he admitted he thought he was in Gramercy instead of Lutcher.
As to the speed of his vehicle Martin testified he was driving between 20 and 25 miles per hour, but after hearing the testimony of a police officer that a speed limit of 20 miles per hour prevails in Lutcher, he attempted to change his estimate by saying he had been driving at a rate of between 15 and 20 miles per hour. Mrs. Camp, who sat in the front seat with Martin, has a different idea about the speed of the car. Her testimony is that it was traveling at about 35 to 40 miles per hour. Rodrigue, the night watchman, testified that Martin’s automobile in traversing the embankment hit the railroad tracks at considerable speed, made a loud noise and “bounced,” all of which served to attract his attention to the vehicle just before the collision occurred. Another indication of its rapid speed is the fact that after the impact Martin’s car travelled about 35 feet, striking and knocking down a sign post, and then went on about 40 feet farther.
Mrs. Schexnayder says she never observed Martin’s car until just before the moment of impact. Martin’s testimony is that he saw the Schexnayder car “way back up the street” and that it was “coming pretty fast” and he “went on through presuming that the other car was going to stop.” However, subsequently, when Martin was asked when was the first time he saw the Renault, he replied:
“I saw the Renault just before it hit me. Coming over that railroad dump (embankment) I didn’t see the car until it was right on me.”
*619 Martin and his witnesses declare that the signal light was green for traffic moving on Albert Street although none of them could state the position of the light standard. The fact is that the traffic light in question is located in the northeast corner of the intersection. Martin’s testimony regarding the light, as compared with that of Mrs. Camp, is interesting. He stated that the light was red before he reached the railroad crossing, but as he went up on the embankment Mrs. Camp said to him “the light is going to change,” and as the light turned green he went on into the intersection. When Mrs. Camp was asked if she noticed the traffic light as the car approached Railroad Avenue, she answered that she did and that she had commented about it thus: “I said look, we are going to make the red light and he (Martin) said, no we are not, it is turning green.” What Martin was saying was that Mrs. Camp called his attention to the change in the light while, on the other hand, it was he who, according to her version, called her attention to the light “turning green.”
Counsel for appellants argue strenuously that Mrs. Schexnayder’s statement that the light showed yellow before flashing the green signal is an inconsistency so glaring as to have the effect of completely destroying the probative value of all of her testimony. We repeat we do not know why Mrs. Schexnayder was prompted to allude to a yellow light, but in view of the inconsistencies and contradictions to be found in the testimony of the defense witnesses, we are unwilling to say that we should disregard Mrs. Schexnayder’s testimony and accept in its stead such confused statements as emanated from Martin, Mrs. Camp and Templet. The record has been carefully read and analyzed by us, and we reach the conclusion that there is no manifest error in the judgment. The finding of the trial judge that Martin came over the railroad embankment at a fast rate of speed and dashed into the intersection in the teeth of a red light facing him is supported by evidence the judge believed. This is the type of case where the court should rely on the time-honored doctrine that the findings of a trial court are entitled to great weight, particularly where such findings depend on the veracity of witnesses, and should not be reversed unless manifest error is shown.
In cases where it is obvious that witnesses on one or both sides are guilty of making untruthful statements, it is important, to further the ends of justice, that the findings of fact by the trier of the case be not disturbed since he is in the superior position to observe the reactions of the witnesses while they are under examination and determine and weigh their credibility. Webre v. Jones, La.App., 92 So.2d 110; Ginn v. Ginn, La.App., 48 So.2d 655.
Mrs. Schexnayder, aged 60, was awarded $10,000. Her injuries were diagnosed by Dr. Carl Poche, who saw her three times, as a severe strain of cervical vertebral ligaments and muscles from forced flexion and extension of the head; strain of para-vertebral muscles of midback (around T12) ; contusion and hematoma of left leg below the knee.
She then went to a Dr. Johnson three times and afterward consulted Dr. Byron M. Unkauf, an expert in the field of orthopedics, who first examined her on August, 5, 1960, several months after the accident. She visited Dr. Unkauf eight times in all and is still under his care. Dr. Unkauf’s testimony convinces us that Mrs. Schex-nayder sustained a strain of the lumbar spine and a ruptured intervertebral disc at D-4 and/or 1^5. She also sustained some sort of an injury to her neck, but Dr. Unkauf thought her back complaints “far overshadowed her neck complaints.” We are unable to ascertain from the testimony the exact nature or severity of the neck injuries. However, the record shows that Mrs. Schexnayder has suffered much pain and discomfort from the date of the accident to the time of the trial and is handicapped in her activities, particularly with reference to housework and the news *620 paper distribution. She is nervous and experiences difficulty in resting at night. The course of treatment prescribed by Dr. Un-kauf included sleeping on boards, hot tub soaks, local heat, heating pad, hot water bottle, muscle relaxation and tranquilizers and at irregular intervals injections of novocain and cortisone to relieve pain. Dr. Unkauf’s opinion was that the patient has been given an adequate period of conservative treatment with little relief from her complaints and with but little change in the clinical findings. His opinion was that if she continued to have pain, the best course to pursue would be to have a myelogram made, and that if protrusions appear, the disc or discs should be surgically removed. The doctor went on further to state that if the myelogram test should be negative, he thought an exploratory operation would be justified due to the fact that the X-rays show a marked narrowing of the space between the vertebrae. However, he thought the advisability “of that would be left up to the discretion of the surgeon.” Nowhere in Dr. Unkauf’s testimony does he unquali-fiedly recommend an operation nor can we find in Mrs. Schexnayder’s testimony that she has agreed to withstand surgical procedure to alleviate her condition. Whether, in the future, Mrs. Schexnayder must endure the rigors of surgery we do not know.
But, considering the medical testimony adduced by plaintiffs, to which there is no countervailing evidence offered by defendants, it appears that Mrs. Schex-nayder has sustained painful and severe injuries which may prove to be permanent and require surgery for correction. She has suffered' and will likely continue to suffer severe pain, distress and discomfort. We think that the award of $10,000 for personal injuries will do ample justice to all parties concerned. See Thornton v. F. Strauss & Son, Inc., La.App., 129 So.2d 580.
Irwin J. Schexnayder was awarded $1,316.39, of which $251.39 represents medical expenses, and this latter amount was properly allowed. However, the amount of the judgment includes $1,065 for the complete loss of the Renault automobile which was owned by the community existing between the plaintiffs, but we think that the record contains insufficient proof to warrant such recovery. The automobile had been purchased about seven months before the accident at a cost of $1,645. Schex-nayder was asked: “Where was your Renault damaged?” and he replied: “On the right side on the front, the front fender on the right hand side. The hood.” He also stated that the steering wheel “was all crooked.” He kept the damaged car in his yard for some months and claims he was unsuccessful in attempts to have repairs made but gave no reason therefor. At any rate “Tri-City Renault in Baton Rouge” came to his home and took the car away, and he does not know where it is at the present time. Clearly the damages sustained by the automobile cannot be determined from such meager and sketchy testimony. According to a stipulation appearing in the record, Schexnayder has filed suit for the value of the car against Calvert Fire Insurance Company. There is another suit pending in which Schexnayder is defendant, that being the suit brought by the finance company which held the chattel mortgage on the Renault. As to the outcome of the suits we know nothing. Schexnayder stated that for four months after the accident while the car was in his yard he paid the monthly installments due on the mortgage but quit paying because the car was wrecked and “nobody was trying to fix my car.” We think, under the circumstances, Schex-nayder should be nonsuited with reference to his demand for the value of the automobile.
In his answer to the appeal Schexnayder prays that he be allowed to recover for the loss of earnings sustained by virtue of his wife’s injuries and that he also recover a sum sufficient to defray her future medical expenses, including the cost of an operation. We agree with the trial judge’s conclusion that these two items are too speculative even *621 to discuss and, therefore, they are disallowed.
For the reasons assigned, the judgment appealed from is amended by reducing the amount recovered by Schexnayder from $1,316.39 to $251.39, and dismissing his claim for property damage as of nonsuit, and as thus amended and in all other respects the judgment is affirmed. Costs of this appeal are to be paid by plaintiffs-ap-pellees.
Amended in part; affirmed in part.